Q4SGpilC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          26 Cr. 142 (CM)

STEFAN PILDES,

                                        Conference
                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        April 28, 2026
                                        02:00 p.m.

Before:

                    HON. COLLEEN McMAHON,

                                        District Judge

                         APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  VARUN GUMASTE
     ANDREW STAHL
     Assistant United States Attorneys

SHER TREMONTE
     Attorneys for Defendant
BY:  NOAM BIALE
     EMMA SCHWARTZ

Q4SGpilC

(Case called)

MR. GUMASTE:  Good afternoon, your Honor.  Varun Gumaste for the United States.  I am joined at counsel table by Special Assistant United States Attorney Andrew Stahl.  I apologize.  I don't know if my mic --

THE COURT:  It will be on shortly.

MR. BIALE:  Good afternoon, your Honor.  Noam Biale and Emma Schwartz for Mr. Pildes, who is present in the courtroom to my left.

THE COURT:  Hello, Mr. Biale and Ms. Schwartz.

Have a seat.  I am a little slow on the uptake today. I had some surgery on my shoulder on Friday, so I'm having a hard time typing.  So why don't you start?

MR. GUMASTE:  Happy to, your Honor.  So to provide the Court with a brief update on where we are right now, Mr. Pildes was arrested on April 15, he was presented and arraigned in magistrate court, and he was released on a bond with several conditions, your Honor.  I believe that the parties can update the Court on the status of the defendant's compliance with those conditions.  I'll leave that to defense counsel at the moment.

But since that time, your Honor, the parties have also been in preliminary discussions about next steps in this case, including today.  Your Honor, there is a substantial amount of discovery that the government intends to begin producing on a

Q4SGpilC

rolling basis to the defendant.  I'm happy to provide the Court with a detailed breakdown of what that is.

THE COURT:  I'd love to hear it.

MR. GUMASTE:  So the government anticipates that Rule 16 discovery would consist of records from dozens of third parties.  Your Honor, this is a multi-year investigation that's been ongoing that includes such third parties as financial institutions, ticket processing companies, web hosting providers, phone companies, and the like.  Your Honor, in addition --

THE COURT:  How about bars?

MR. GUMASTE:  There are also materials that implicate the bars that are at issue in this case, your Honor, as well. There's also --

THE COURT:  I wasn't thinking of implicate.  Look, all I've done is read the criminal complaint.  Maybe you can explain to me what it is that Mr. Pildes did, as far as you're concerned, that constitutes criminal activity.

MR. BIALE:  Allegedly, your Honor.

THE COURT:  Correct.  That you say constitutes criminal activity.

MR. GUMASTE:  Of course, your Honor.

THE COURT:  No jury has said that yet.

MR. GUMASTE:  So Mr. Pildes is alleged to have, from at least November of 2019 to April of 2026, carried out a

Q4SGpilC

scheme to defraud ticket purchasers and venues that participated in an annual event known as SantaCon that takes place here in New York City in December of each year. Mr. Pildes advertised that SantaCon was an event to benefit charity.  He did so to both the ticket purchasers and the bars that participated in the annual event.  And he also --

THE COURT:  The ticket purchasers are the drunken kids who walk around the streets on the second Saturday in December wearing Santa clothes; right?  That's the ticket purchasers, or are bars also -- did they also purchase tickets to participate as sponsored bars?  I'm trying to figure out what he did.

MR. GUMASTE:  Your Honor, the allegations are that the ticket purchasers are individuals who participate in the event.

THE COURT:  They are drunken kids who walk around in the Santa costumes.

MR. GUMASTE:  They dress up in various costumes, and they travel from bar to bar.  They purchase a ticket in connection with the event, your Honor, and in exchange for that ticket, in part, they receive access to the various bars along the route, your Honor.

THE COURT:  OK.

MR. GUMASTE:  In addition to that, the bars themselves also agree to participate.  And in exchange --

THE COURT:  It will be an official SantaCon stop.

MR. GUMASTE:  Yes, your Honor.  And in exchange for

Q4SGpilC

being signed up as an official SantaCon venue, one of the things they have to provide is a charitable donation in the form of a sales commission of their food and beverage sales during that day.  Your Honor, that money, additionally, was supposed to have gone to charity.

THE COURT:  And the charity, you say, turns out to be Mr. Pildes?

MR. GUMASTE:  Yes, your Honor.  The government's allegations are that Mr. Pildes raised millions of dollars during this time period for charity but, in reality, diverted a substantial portion to an entity that he controlled and used the money for personal expenses.

THE COURT:  OK.  Now, can I just be curious about this?  Because, like everyone else would lives in New York City, I'm assaulted by SantaCon on the second Saturday of December, which is when I think it takes place, and I have to stay home because I don't like walking around the vomit that's left by the drunken kids who are wearing Santa costumes.

OK.  Is there a national SantaCon?  How does Mr. Pildes become the sponsor of this event in New York City?  Does he have a license from the city?  Why is he allowed to sell tickets in the first place?  Is he the official SantaCon and maybe there are some unofficial SantaCons?  Is he not the official SantaCon?  What's the deal here?

MR. GUMASTE:  The government's understanding, your

Q4SGpilC

Honor, is that Mr. Pildes' organization, which is Participatory Safety Incorporated, is the entity that organizes what the government believes to be the largest SantaCon event that takes place in New York City.  And that entity does secure licenses on an annual basis with the police department and the parks department in order to actually put on the event, your Honor.

THE COURT:  So he really is Mr. SantaCon.  He is the official SantaCon guy --

MR. GUMASTE:  That's the government's position, yes.

THE COURT:  -- in New York City?

MR. GUMASTE:  Yes.

THE COURT:  That's the government's position.  All right.  And the money comes from two sources.  It comes from the kids -- why they would buy a ticket, I have no idea, but they do -- and it comes from the -- maybe you can't get into the sponsored bars if you don't have a ticket?  I don't know. And then there are the sponsored bars, and they pay a percentage of the take on that day?

MR. GUMASTE:  That is correct, your Honor.

THE COURT:  OK.  Got it.  And so you say that this money found its way into the wrong pocket, the pocket being Mr. Pildes' pocket?

MR. GUMASTE:  That is correct, your Honor?

THE COURT:  OK.  So your discovery is of whose financial records besides his?

Q4SGpilC

MR. GUMASTE:  It's primarily -- so among the third parties that the government has records from are financial institutions, which have provided records for Mr. Pildes, for his entities that he controls.  Those are the primary financial records that the government has in its possession, but there are a substantial amount of other third party records outside of the financial records as well.

THE COURT:  I would assume that you will have records of the take from the bars, records from the kids, records from the bars about how much they contributed?

MR. GUMASTE:  So, your Honor, with respect to the ticket purchasers, those tickets are sold primarily on a third party ticket processing website.  We have records from that third party ticket processing website that document the number of individuals and the amount they paid in order to purchase tickets for the event.

With respect to the bars itself, it comes from a variety of sources, your Honor, the bars themselves as well as e-mail accounts that Mr. Pildes operated in connection with the SantaCon event, as well as the financial accounts that I referenced earlier.

THE COURT:  OK.  Great.  So you've got all of that discovery to turn over, and it's voluminous.

MR. GUMASTE:  It is, your Honor.

THE COURT:  OK.  Great.  I think you should turn it

Q4SGpilC

over as quickly as possible.

MR. GUMASTE:  We intend to do so, your Honor.

THE COURT:  Terrific.

So, Mr. Biale --

MR. BIALE:  Yes, your Honor.

THE COURT:  Good afternoon.

MR. BIALE:  Good afternoon.  Nice to see you again.

THE COURT:  How are you?

MR. BIALE:  I'm well.  The Court is obviously already familiar with the event.

THE COURT:  I am familiar with the event.  It's not possible to live in New York City and not be familiar with the event.

MR. BIALE:  A source of joy to many and of annoyance to some.

THE COURT:  Yes.

MR. BIALE:  So, your Honor, we have discussed with the government a plan for them to turn over the discovery to us.  I understand that in addition to what was just discussed, there are some Google data that is still being sifted through by the government that they are going to have to turn over.

What I think probably makes sense, Judge, is for us to take some time to digest the initial batch of discovery and come back before the Court --

THE COURT:  In September.

Q4SGpilC

MR. BIALE:  That could be, or it could be sooner.

THE COURT:  In September.

MR. BIALE:  Then I think it should not be sooner, Judge.  We should come back in September.

THE COURT:  It will give you plenty of time to digest the data.

MR. BIALE:  I appreciate that, your Honor.  Look, I don't know what data they have.  It seems to me like, although the discovery is voluminous, the allegation seems --

THE COURT:  Very narrow.

MR. BIALE:  -- very simple.

THE COURT:  Very Narrow.

MR. BIALE:  Obviously, we want to put eyes on all of the evidence that the government has gathered.

THE COURT:  That's true.

MR. BIALE:  I think coming back in September makes sense.  Now I can address the bond issue very briefly.

THE COURT:  OK.  What's the deal with the bond?

MR. BIALE:  So Mr. Pildes has satisfied all of the conditions of the bond except one, which is --

THE COURT:  What was the bond that was set?

MR. BIALE:  It was a $300,000 personal recognizance bond.  He was released on his own signature on the 15th, signed by two cosigners.  Those two individuals, who are his wife and his mother, have since signed the bond, so we are set on that.

Q4SGpilC

The one leftover piece is that he is pledging his home in New Jersey as collateral on the bond, and we've just been going back-and-forth with the government a little bit on what's the proper language in the confession of judgment that would need to be submitted in Passaic County in New Jersey.  We are very close.  I think we could use an additional week to satisfy that condition --

THE COURT:  Take it.

MR. BIALE:  -- and we will be set.

THE COURT:  Take it.

MR. BIALE:  Thank you, Judge.  From our perspective, that's all there is to do today.

THE COURT:  OK.  Is there anything else from the government's perspective?

MR. GUMASTE:  Just one other thing, your Honor.  In connection with the government's discovery productions, the government and defense have already discussed the possibility of a protective order in this case.

THE COURT:  Why would you need a protective order? You people are addicted to protective orders.  What's the protective order here?

MR. GUMASTE:  It's a narrowly tailored protective order.

THE COURT:  Narrowly tailored to protect what?  Whose secrets are we protecting here?

Q4SGpilC

MR. GUMASTE:  The primary reason for the protective order, your Honor, is to protect the privacy interests of the individuals, the victims in this case, both the ticket purchasers and the bar owners.  There's a tremendous amount of personal identifying information in the materials that the government intends to produce.

If the government were instead to have to redact or somehow come up with some other solution in order to address that material, it would require a significant amount of more time.  In the interest of expediting discovery, the government's point of view, which I understand the defense agrees with, is that a protective order is fine in this case and is one that's warranted.  Your Honor, it is limited to just -- and I'm sure that the Court is familiar with the government's typical protective orders that we seek.  I can tell the Court that in this case, it is limited to the category of disclosure material in the protective order, which is the lowest category designation that the government typically seeks.

THE COURT:  OK.

MR. GUMASTE:  I have nothing further, your Honor.

THE COURT:  All right.  Mr. O'Neill, we need a date.

THE DEPUTY CLERK:  September 15, 2:00.

THE COURT:  All right.  Then I will see you on September 15 at 2:00.  I think that's plenty of time for the

Q4SGpilC

government to have produced discovery and for the defense to have gone through discovery.  So at that point, we will either set a motion schedule or pick a trial date, one of the two.  OK.

MR. GUMASTE:  Thank you, your Honor.  And the last thing, I apologize, is the government requests to exclude time until the September 15 date.

THE COURT:  I was planning to do that.

MR. BIALE:  I have no objection to that, your Honor, of course.  And I did want to just ask:  to the extent that we have issues in terms of modification of the bond that come up between now and then, would the Court like that directed to you or to the Magistrate Judge?

THE COURT:  It's mine now.  This is now my baby.

MR. BIALE:  I'm happy to send them to your Honor, then.

THE COURT:  OK.  Great.  Thank you.  See you in September.

(Adjourned)